UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF CASE

Civil Action No.    1:08-02983 (WHP)

| | |
|---|---|
| RAMADA WORLDWIDE INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> Y&Y, INC., a North Carolina Corporation, KANTILAL C. PATEL, an individual, DILIP K. PATEL, an individual, PANKAJ K. PATEL, an individual, and KIRON K. PATEL, an individual, <br><br> Defendants. | |

**COMPLAINT**

Ramada Worldwide Inc. ("RWI"), by and through its counsel Gibbons, P.C., by way of Complaint against defendants Y&Y, Inc. ("Y&Y"), Kantilal C. Patel ("K.C. Patel"), Dilip K. Patel ("D.K. Patel"), Pankaj K. Patel ("P.K. Patel") and Kiron K. Patel ("K.K. Patel") hereby alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff RWI is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.      Defendant Y&Y is a corporation organized and existing under the laws of the State of North Carolina, with its principal office at 5 Laura Lane, Thomasville, NC 27360 and its registered office at 1011 E. Innes Street, Salisbury, NC 28144..

3.      Defendant K.C. Patel, on information and belief, is a principal of Y&Y and a citizen of the State of New York, residing at 81-36 258th Street, Floral Park, New York 11004.

#1250527 v1<br>101629-60971

4.      Defendant D.K. Patel, on information and belief, is a principal of Y&Y and a citizen of the State of North Carolina, residing at 6406 Derby Way, Trinity, North Carolina 27370.

5.      Defendant P.K. Patel, on information and belief, is a principal of Y&Y and a citizen of the Commonwealth of Virginia, residing at 108 Acres Court, Lynchburg, Virginia 24502.

6.      Defendant K.K. Patel, on information and belief, is a principal of Y&Y and a citizen of the State of North Carolina, residing at 6406 Derby Way, Trinity, North Carolina 27370.

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interests and costs, exceeds the sum of $75,000.00.

8.      This Court has personal jurisdiction over the defendants by virtue of, among other things, the June 30, 1992 License Agreement by and between Y&Y and RWI (the "License Agreement"). Pursuant to Section 30 of the License Agreement, Y&Y has consented to "the personal jurisdiction of the Courts of the State of New York and the United States District Court for the Southern District of New York. . ."

9.      Venue in the Southern District of New York is proper pursuant to Section 30 of the License Agreement, inasmuch as that provision contains an express waiver by Y&Y of any objection to venue in this District. 28 U.S.C. § 1391(a) provides, in pertinent part, that a suit based on diversity of citizenship jurisdiction may be brought "in a judicial district where any defendant resides." Under 28 U.S.C. § 1391(c), a defendant corporation "resides" in any judicial

#1250527 v1
101629-60971

district in which it is subject to personal jurisdiction at the time the action is commenced. Here, as Y&Y has consented to the personal jurisdiction of the United States District Court for the Southern District of New York, venue in this District is appropriate.

## ALLEGATIONS COMMON TO ALL COUNTS
## THE AGREEMENTS BETWEEN THE PARTIES

10.    On or about June 30, 1992, RWI entered into the License Agreement with Y&Y for the operation of a 52-room guest lodging facility located at Laura Lane & Highway 109 & I-85, Thomasville, North Carolina, 27360, Unit No. 2226-81896 (the "Facility"). A true and correct copy of the License Agreement is attached hereto as Exhibit A.

11.    Pursuant to Section 4 of the License Agreement, Y&Y was obligated to operate a Ramada® guest lodging establishment at the Facility for a fifteen-year term.

12.    Pursuant to Section 6 and Schedule C of the License Agreement, Y&Y was required to make certain periodic payments to RWI for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively "Recurring Fees").

13.    Pursuant to Section 8(b) of the License Agreement, Y&Y was required to prepare and submit monthly financial reports to RWI disclosing, among other things, the number of rooms sold, the average daily room rates and a calculation of all due and payable Recurring Fees.

14.    Y&Y was also required to maintain accurate financial information, including books, records and accounts, relating to the gross room revenue of the Facility and, pursuant to Section 8(d) of the License Agreement, Y&Y authorized RWI to examine, audit and make copies of the entries in those books, records and accounts.

#1250527 v1
101629-60971

15.    Under Section 21(c)(ii) of the License Agreement, RWI was authorized to immediately terminate the Agreement if Y&Y discontinued operating the Facility as a Ramada® guest lodging establishment.

16.    Pursuant to Section 22 of the License Agreement, Y&Y agreed that, in the event of a termination of the License Agreement in accordance with Section 21(c), it would pay liquidated damages to RWI in an amount calculated using a formula specified in the License Agreement. Those liquidated damages were due within thirty (30) days of the date of termination.

17.    Section 22 specified that liquidated damages for the Facility would be no less than the product of $2,000.00 multiplied by the number of guest rooms (52) in the Facility.

18.    Under Section 6(c) of the License Agreement, interest accrues on any amount due under the Agreement "at the rate of 1.5% a month or the maximum rate permitted by applicable law."

19.    Effective as of the date of the License Agreement, Defendants K. C. Patel, D. K. Patel, P. K. Patel and K. K. Patel (collectively, the "Guarantor Defendants") provided RWI with a guaranty of Y&Y's obligations under the License Agreement and all amendments thereto (the "Guaranty"). A true and correct copy of the Guaranty is attached hereto as Exhibit B.

20.    Pursuant to the terms of the Guaranty, the Guarantor Defendants agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform each obligation required of Licensee under the [License] Agreement."

#1250527 v1
101629-60971

**DEFENDANT Y&Y'S BREACH AND THE TERMINATION OF THE LICENSE AGREEMENT**

21.     On or about March 18, 2005, Y&Y advised RWI that it was unilaterally terminating the License Agreement by ceasing to operate the Facility as a Ramada® guest lodging establishment as of March 31, 2005.  By letter dated April 6, 2005 ("Termination Letter"), a true and correct copy of which is attached hereto as Exhibit C, RWI acknowledged that the License Agreement had terminated on March 31, 2005 (the "Termination Date").

22.     Pursuant to the Termination Letter, RWI advised Y&Y that (a) it was to immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as part of the Ramada® System; (b) it was to discontinue the use of other materials on the premises so as to effectively distinguish the premises from its former appearance as a Ramada®; (c) all items bearing the Ramada Marks had to be removed; (d) all signs and any listings in directories and similar guides in which the Facility was identified as a Ramada® had to be changed; (e) Y&Y was required to pay RWI liquidated damages in the sum of $104,000.00, as required under Section 22 of the License Agreement; (f) Y&Y had to completely de-identify the Facility within fourteen (14) days of the Termination Date; and (g) demand was made for all outstanding Recurring Fees through the Termination Date.

23.     By letter dated May 30, 2006, a true and correct copy of which is attached hereto as Exhibit D, RWI reiterated Y&Y's post-termination obligations under the License Agreement, including the requirement that, upon termination, Y&Y completely "de-identify" the Facility as a Ramada.  RWI also advised that Y&Y was obligated to pay RWI liquidated damages and all outstanding Recurring Fees.

#1250527 v1
101629-60971

## FIRST COUNT

24.     RWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 23 of the Complaint.

25.     Pursuant to Section 8(d) of the License Agreement, Y&Y agreed to allow RWI to examine, audit, and make copies of Y&Y's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

26.     The calculation of the monetary amounts sought by RWI in this action is based on the gross room revenue information supplied to RWI by Y&Y and, to the extent there has been non-reporting, RWI's estimate as to the gross room revenue earned by Y&Y.

27.     The accuracy of this information cannot be confirmed without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Y&Y.

**WHEREFORE**, RWI demands judgment ordering that Y&Y account to RWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the end of the date of termination of the License Agreement.

## SECOND COUNT

28.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 27 of the Complaint.

29.     On March 31, 2005, Y&Y unilaterally terminated the License Agreement by ceasing to operate the Facility as a Ramada® guest lodging establishment.

30.     Section 22 of the License Agreement provides that, in the event that the License Agreement is terminated due to an action of the Licensee, Y&Y shall pay liquidated damages to RWI within 30 days of such termination.

6

31.    As a result of the termination of the License Agreement, Y&Y is obligated to pay RWI liquidated damages in the amount of $104,000.00, as calculated pursuant to Section 22 of the License Agreement.

32.    Notwithstanding RWI's demand for payment, Y&Y has failed to pay RWI liquidated damages as required in Section 22 of the License Agreement.

33.    RWI has been damaged by Y&Y's failure to pay liquidated damages.

**WHEREFORE**, RWI demands judgment against Y&Y for liquidated damages in the amount of $104,000.00, together with interest and costs of suit.

### THIRD COUNT

34.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 33 of the Complaint.

35.    By virtue of the premature termination of the License Agreement, RWI sustained a loss of future revenue over the remainder of the term of the License Agreement.

36.    If the Court determines that Y&Y is not liable to pay RWI liquidated damages as required by Section 22 of the License Agreement, then, in the alternative, Y&Y is liable to RWI for the actual damages RWI suffered as a result of the premature termination of the License Agreement.

37.    RWI has been damaged by Y&Y's breach of its obligation to operate a Ramada® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, RWI demands judgment against Y&Y for actual damages, in an amount to be determined at trial, together with interest and costs of suit.

#1250527 v1
101629-60971

## FOURTH COUNT

38.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 37 of the Complaint.

39.    Pursuant to Section 6 and Schedule C of the License Agreement, Y&Y was obligated to remit Recurring Fees to RWI.

40.    Despite its obligation to do so, Y&Y failed to remit certain of the Recurring Fees due and owing under the License Agreement.  Currently, a total of $4,778.63 in Recurring Fees remains outstanding.

41.    Y&Y's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged RWI.

**WHEREFORE**, RWI demands judgment against Y&Y for the Recurring Fees due and owing under the License Agreement, together with interest and costs of suit.

## FIFTH COUNT

42.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 41 of the Complaint.

43.    At the time of the termination of the License Agreement, Y&Y was obligated to pay RWI Recurring Fees**.**

44.    Despite its obligation to do so, Y&Y failed to remit certain of the Recurring Fees due and owing under the License Agreement.  Currently, a total of $4,778.63 in Recurring Fees remains outstanding.

45.    Y&Y's failure to compensate RWI constitutes unjust enrichment and has damaged RWI.

8

**WHEREFORE**, RWI demands judgment against Y&Y for the Recurring Fees due and owing under the License Agreement, together with interest and costs of suit.

## SIXTH COUNT

46.     RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 45 of the Complaint.

47.     Pursuant to the terms of the Guaranty, the Guarantor Defendants agreed, among other things, that upon Y&Y's default under the License Agreement, they would immediately make each payment and perform each obligation required of Y&Y under the License Agreement.

48.     Despite their obligation to do so, the Guarantor Defendants have failed to make any payments or perform each of Y&Y's obligations under the License Agreement.

49.     Pursuant to the Guaranty, the Guarantor Defendants are liable to RWI for Y&Y's liquidated damages in the amount of $104,000.00, or actual damages in an amount to be determined at trial,  and all outstanding Recurring Fees that Y&Y owes under the License Agreement, in the current amount of $4,778.63.

**WHEREFORE**, RWI demands judgment against the Guarantor Defendants for all liquidated damages or actual damages and Recurring Fees due and owing under the License Agreement, together with interest and costs of suit.

#1250527 v1
101629-60971

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973)596-4500
pdunican@gibbonslaw.com
rbrady@gibbonslaw.com
Attorneys for Plaintiff
Ramada Worldwide Inc.

By _____

Patrick C. Dunican, Jr.
Robert C. Brady

Dated:  March 20, 2008

#1250527 v1
101629-60971

# Exhibit A

CLK/jam
1840d
4/14/92 (REV 2)

THOMASVILLE, NORTH CAROLINA
File No. 4723

RAMADA
**LICENSE AGREEMENT**

THIS LICENSE AGREEMENT ("Agreement"), dated June 30 , 1992, is between RAMADA FRANCHISE SYSTEMS, INC. ("Ramada"), a Delaware corporation, with offices at 339 Jefferson Road, Parsippany, New Jersey 07054, and Y & Y, Inc., a North Carolina Corporation, whose address is 1328 Jake Alexander Blvd., Salisbury, NC 28146-8356, ("Licensee"). In consideration of the following mutual promises, the parties agree:

1. **Ramada System**. Ramada has acquired from Franchise System Holdings, Inc. ("FSH") pursuant to a Master License Agreement dated as of September 18, 1989 as amended and restated as of July 15, 1991, the exclusive right to use and to sublicense certain tradenames, trademarks, service marks and the distinctive Ramada System ("System") in the United States and the District of Columbia for providing hotel services to the public under the Ramada name and certain services to its licensees, including a centralized reservation system, advertising, publicity and training services. Ramada has further acquired, pursuant to an agreement dated as of November 1, 1991 with FSH (the "Ramada Limited Agreement"), the additional exclusive right to sublicense the Mark "Ramada Limited" in the United States and the District of Columbia.

2. **System Components**. The System includes: the rights of Ramada under the Master License Agreement to the service mark "RAMADA" and under the Ramada Limited Agreement to the service mark "RAMADA LIMITED", plus other related service marks, trademarks, names, logos and derivations (regardless of whether registered or existing at common law), associated business good will (collectively "Marks"); other intellectual property, including copyrights, trade secrets and know-how; advertising and other marketing programs; operating, quality assurance, training and consulting programs and procedures; system standards (the "System Standards") as set forth from time to time in the System Standards Manual (hereinafter defined); a centralized reservation system (hereinafter defined); and other services. Ramada reserves the right, in its sole discretion, to amend, delete or enhance any portion of the System, including any of the Marks, to maintain or enhance System reputation or to improve System license marketability.

3. **License**.

   (a)  **Grant**. Ramada grants, effective and commencing only upon the Opening Date (hereinafter defined), and Licensee accepts, a non-exclusive license (the "License") to operate a Ramada Limited (the "Facility"), only at the Location indicated below, using the System under the Mark "RAMADA LIMITED". Any additional or secondary names or geographic designations to be used by the Licensee or in connection with the Facility may be adopted by Licensee only with Ramada's prior written consent which may be withheld, conditioned or withdrawn in Ramada's sole discretion.

   (b)  **Facility**. The Facility includes a parcel of land located at

LAURA LANE & HIGHWAY 109 & I-85, THOMASVILLE, NC  27360 (the "Location") (as more fully described in Schedule A attached hereto), all common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, furniture, fixtures and equipment (the last three collectively "FF&E") and other improvements now or hereafter existing at the Location.

4.  __Term__.  The term of this Agreement (the "License Agreement Term") commences upon the date of execution (the "Effective Date") of this Agreement by Ramada and Licensee and terminates (unless sooner terminated as provided herein) on the day prior to the fifteenth anniversary of the date on which Ramada authorizes Licensee to open the Facility as part of the System (the "Opening Date").  The term of the License (the "License Grant Term") commences on the Opening Date and terminates (unless sooner terminated as provided herein) on the day prior to the fifteenth anniversary of the Opening Date. Ramada shall confirm the Opening Date in writing, and upon request of Ramada, Licensee and Ramada shall execute a Declaration of License acknowledging the commencement and termination dates of the License Grant Term.  Certain of the Licensee's duties and obligations shall survive termination of this Agreement, as provided herein.  NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

5.  __Initial Fees__.  Licensee shall pay Ramada a non-refundable application fee (the "Application Fee") of $2,000.00 which fee is to defray the costs of evaluating Licensee's application and shall be applied towards Licensee's Initial Fee.  Licensee shall pay an initial franchise fee (the "Initial Fee") of $16,500.00.  The total fee due upon execution of this Agreement by Licensee is $16,500.00.

6.  __Recurring Fees__.

(a)  Royalties, assessments and fees ("Recurring Fees") shall accrue monthly (except as provided herein) during the License Grant Term, and are payable to Ramada in U.S. dollars by the 15th day of the month following the month in which they accrue, without formal billing or demand by Ramada. Such Recurring Fees shall include the following:

(i) To Ramada, a "__Royalty__" of 4% of gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for food and beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes ("Gross Room Revenues"), but not less than the Minimum Annual Royalty described below; and,

(ii) To RINA, a marketing assessment, a reservation system assessment, and/or other assessments and fees as may be set forth on Schedule "C" attached hereto.  Such assessments for fees are collected, disbursed and otherwise administered by Ramada on behalf of RINA and such assessments or fees shall be maintained by Ramada in a separate account or accounts containing such assessments or fees from Ramada and its licensees.  The fees set forth in Schedule "C" to this Section 6 may be adjusted or increased or new charges may be made by Ramada upon new or additional services and products, but only upon recommendation of the Executive Committee of RINA and approval by Ramada.

(iii)  To Ramada, a "__Casualty Fee__" in the event that the

-2-

Facility fails to operate in the normal course of business for any period due to a Casualty or Condemnation (as such terms are defined in Section 21(d) hereof), in an amount equal to the average amount due per month over the preceding 12 months (or the average monthly amount for such shorter period as the Facility has been open) pursuant to Sections 6(a)(i) and 6(a)(ii), multiplied by the number of months or fractions thereof of suspension of operations. Acceptance of such fees by Ramada shall not constitute a waiver of Ramada's rights to terminate this Agreement pursuant to Section 21(d) hereof.

(iv) To Ramada, the minimum annual royalty (the "Minimum Annual Royalty") payable pursuant to this Agreement shall be $12,000.00. If the aggregate Royalties based on Gross Room Revenues paid to Ramada for any calendar year commencing after the Opening Date are less than the Minimum Annual Royalty, then within 30 days after the end of such year, Licensee will pay Ramada the difference between such aggregate Royalties and the Minimum Annual Royalty. The Minimum Annual Royalty shall be prorated, during the first and last year of the License Grant Term, by multiplying the Minimum Annual Royalty by a fraction, the numerator of which is the number of days that the Facility is actually open during such year and the denominator of which is 365 or 366, as applicable.

(b)    An amount equal to any federal, state or local sales, gross receipts, use or similar taxes assessed against Ramada with respect to the Recurring Fees, if any, but not including any income tax or optional alternative to income tax, is payable to the extent permitted by applicable law, within 15 days of Licensee's receipt of Ramada's invoice.

(c)    Interest shall accrue at the rate of the lesser of 1.5% per month or the maximum rate permitted by applicable law from the due date of any payment due pursuant to this Agreement which remains unpaid beyond any applicable grace period and shall be payable immediately upon Licensee's receipt of Ramada's invoice.

7.    **New Construction Obligation**. Within ninety (90) days after the Effective Date, Licensee will provide proof of ownership and/or control of the Location. Licensee will commence construction of the Facility within six (6) months from the Effective Date and within eighteen (18) months from the Effective Date, Licensee shall complete such construction, obtain a final inspection and written approval by Ramada and commence operation of the Facility under the System. Failure to comply with this construction schedule will cause automatic termination of the License, except that Ramada, in its sole discretion, may grant extensions of such construction schedule. Licensee shall pay Ramada an extension fee of $1,000 for each month of any such extension. A portion of the Initial Fee described in Section 5 hereof is refundable only in the event Licensee cannot commence construction due to (i) an inability to obtain required zoning variances or modifications or building or other permits, (ii) condemnation of the Facility or Location, or (iii) acts of God which will, as determined in Ramada's sole discretion, permanently or indefinitely prevent construction completion, and Ramada terminates this Agreement under this Section 7; provided that Ramada shall retain $10,000.00 of such fee to defray expenses associated with Ramada's performance of its obligations pursuant to this Agreement. Commencement of construction, for purposes of this paragraph, shall be deemed satisfied upon the occurrence of all of the following:

–3–

(a)  approval by Ramada of a site plan, completed working drawings and detail specifications;

(b)  issuance of required building permits; and

(c)  commencement of concrete pouring for building footings.

Licensee shall not commence construction unless it first secures and maintains, or causes its general contractor to secure and maintain, a policy of comprehensive general liability insurance containing coverage, conditions and for amounts not less than those required of Licensee as set forth in Section 14 hereof, with Ramada (and its agents, subsidiaries and assigns) named as an additional insured, and with a provision for a thirty (30) day written notice of cancellation to Ramada.

The Facility will be designed and built substantially in accordance with the preliminary plans and outline specifications prepared by persons other than Ramada, and reviewed by Ramada solely for conformance with System Standards. The completed Facility shall include the items set forth on Schedule "B". Ramada's review constitutes neither (i) approval of technical, architectural or engineering factors nor (ii) verifications that such plans and specifications conform with federal, state or local laws, regulation or code requirements. Prior to commencement of construction of the Facility or any additions thereto, Licensee will submit and obtain Ramada's written approval of the site plan, completed working drawings and detail specifications (the "Approved Construction Plans"). Failure to obtain Ramada's approval or failure to construct the Facility substantially in accordance with the Approved Construction Plans shall be a default by Licensee under this Agreement. Upon completion of the Facility, Licensee will deliver to Ramada a complete set of final and detailed drawings and specifications, whereupon Ramada may inspect the Facility prior to granting final approval of the Facility. Licensee will not commence any operation of the Facility as part of the System without first obtaining such final approval. It is further understood and agreed that Ramada (or its agents, subsidiaries or assigns) shall not be liable to Licensee, its lenders, contractors, employees, guests or others on account of (1) the review or approval of any such plans, drawings or specifications, (2) any inspection of construction conducted during construction or upon completion of the Facility, and (3) any construction or operation of the Facility pursuant to any such plans, drawings or specifications.

8.  **Records, Reports and Audits**.

(a)  **Records**.  Licensee shall maintain books and records for the Facility, including, but not limited to, books of account, tax returns, governmental reports, daily reports and complete quarterly and annual financial statements (profit and loss statements, balance sheets and cash flow statements), all in accordance with the **Uniform System of Accounts for Hotels** established by the American Hotel and Motel Association, as amended from time to time. Ramada shall have the option to specify another system of accounts. Licensee shall preserve such books and records for at least 5 years from their respective preparation dates.

(b)  **Monthly Reports**.  On or before the 15th day of each month (or portion thereof) during the License Grant Term, Licensee shall send Ramada a

-4-

written financial report in the form prescribed by Ramada (including, but not limited to, monthly financial information, number of rooms sold and average daily room rates), and the computation of all due and payable Recurring Fees. Licensee shall submit any other reports, data and information including, but not limited to, accurate room rate and availability information for Reservation System and Directory purposes as Ramada requests.

(c) <u>Financial Statements</u>.  Licensee shall send Ramada in the form prescribed by Ramada, within 105 days after the end of each operating year of the Facility (an "Operating Year"), an annual financial statement (including profit and loss statement, balance sheet and cash flow statement) for the period ending on the last day of such year.  Such annual financials shall be audited if an independent audit is required by Licensee's lenders or is otherwise prepared at the Licensee's option; otherwise, they shall be accompanied by written certification of Licensee's chief financial officer that such statements fairly present the Facility's financial condition and operating results.

(d) <u>Audits</u>.  During the License Grant Term and for three years thereafter, Licensee shall permit Ramada (or affiliates) and/or any independent accountants selected by Ramada to audit, without prior notice, any Facility financial records.  If such audit discloses a deficiency in any Recurring Fees due Ramada, Licensee shall immediately pay the deficiency and any accrued Interest.  If the deficiency is greater than 3% of the amount paid for the period for which the deficiency exists, then Licensee shall also pay within 10 days of receipt of Ramada's statement, the audit costs and expenses.  If the audit discloses an overpayment, Ramada will, at its option, refund such overpayment to Licensee within 10 days of Ramada's receipt of the audit report or offset such overpayment against Recurring Fees then owed by Licensee.  If three or more such audits disclose a deficiency for which Licensee is obligated to pay the audit costs and expenses, then Ramada shall have the right, in its sole discretion, to require, prior to the start of any Operating Year, certified annual financial statements for that year and any subsequent year specified by Ramada, at Licensee's expense.

9. <u>Proprietary Rights</u>.  Licensee acknowledges and will not contest Ramada's unrestricted and exclusive right, title and interest in and to the System and Ramada's right to grant franchises for use of the System.  Licensee will not contest the validity of the Marks, or any other System intellectual property.  Licensee recognizes that any use of the System, other than pursuant to this Agreement, will cause Ramada irreparable harm for which there is no adequate remedy at law, entitling Ramada to injunctive and other relief. Without limiting the foregoing:

(a) <u>Marks and System</u>.  Licensee does not have and will not acquire any interest in or right to use the System or Marks except under this Agreement.  Licensee may not apply for federal, state or foreign registration of the Marks, or use the Marks in its legal or tradename.

(b) <u>Inurements</u>.  All present and future distinguishing characteristics, improvements and additions to or associated with the System by Ramada, Licensee or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations now or hereafter applied for or granted in connection with the System, shall be the property of Ramada or FSH, as applicable, and inure to their respective

-5-

benefit, and Licensee shall not use or permit others to use any of the same without Ramada's written approval.

(c)  <u>FSH Rights</u>.  In the event Ramada's rights to (i) any of the trademarks, trade names and service marks or the Ramada System shall be terminated pursuant to the terms and conditions of the Master License Agreement dated as of September 18, 1989, as amended and restated as of December 7, 1989 (other than as a result of a purchase option being exercised as set forth therein), or (ii) Ramada shall liquidate, dissolve or otherwise cease to do business, then FSH or its assignee shall have the right to succeed to all of Ramada's rights in, to and under this Agreement and any other agreements between Ramada and Licensee entered into pursuant to the terms of this Agreement, and in such event FSH or its assignee shall be obligated to perform Ramada's duties and assume all of Ramada's obligations under any such agreements.

(d)  <u>Other Systems</u>.  Ramada and its affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging, restaurant and/or other food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with Licensee and/or others (for separate charges) for use of any such non-System marks or other proprietary rights, and (ii) other lodging, restaurant and/or other food and beverage facilities, restaurants and/or other businesses, under the System utilizing modified System Standards.

(e)  <u>Disclosure</u>.  Licensee shall disclose (by signage, letterhead, written disclaimer, posted notice or otherwise) for any purpose, including any state or local assumed name filing, or private or public offering of securities by or for the benefit of Licensee, that it is a System Licensee and not sponsored by or otherwise affiliated with Ramada or its affiliates. Licensee, its principals, or employees shall not represent to any actual or proposed lender, investor, guest, customer, supplier or other person or entity that Ramada or its affiliates have an ownership interest in Licensee or the Facility, or that Ramada or its affiliates are or will be in any way responsible for Licensee's debts or acts, or are participating in any investment offering.

(f)  <u>Confidential Information</u>.  Ramada will send Licensee one copy of each current System Standards Manual, including, to the extent any of the following exist from time to time, Mark Standards manual(s), Design Standards manual(s), Technology Standards manual(s), FF&E Standards manual(s), Operating Standards manual(s) and Maintenance Standards manual(s), (collectively called the "System Standards Manual") more fully described in Section 10 and copies of all separate policy statements in effect from time to time. Ramada will deliver to Licensee from time to time any System Standards Manual revisions and/or supplements. Licensee shall take all appropriate actions (including execution of appropriate employee and third-party confidentiality agreements) to preserve the confidentiality of any System trade secrets and other proprietary information not generally known to the lodging industry (collectively, "Confidential Information"), including confidential portions of the System Standards Manual or information otherwise imparted to Licensee and/or its employees and representatives prior to or during the License Agreement Term. Licensee shall not permit copying of

-6-

Confidential Information and shall use Confidential Information only for the Facility and pursuant to this Agreement. Upon termination, (or earlier, as reasonably requested by Ramada), Licensee shall return to Ramada all originals and copies of System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended from time to time.

Licensee's obligations under this subsection shall commence on execution of this Agreement and continue until the earlier of 5 years from the date the License Grant Term ends or the longest time after such termination permitted by applicable law, regardless of the reason for termination.

(g)    Litigation. Licensee shall promptly notify Ramada, in writing, (i) of any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) Licensee, Ramada or any of Ramada's affiliates.

Ramada will have the sole right and responsibility to handle disputes with third parties concerning use of all or any part of the System, and Licensee will, at its reasonable expense, extend its full cooperation to Ramada in all such matters. Ramada need not initiate suit against imitators or infringers, or any other suit or proceeding to enforce or protect the System. Licensee will make every effort consistent with the foregoing to protect, maintain and promote the name RAMADA LIMITED and its distinguishing characteristics, and the other service marks, trademarks, slogans, or other constituent parts of the System.

(h)    Commonality. Licensee acknowledges that Ramada is affiliated with or in the future may become affiliated with other hotel or other hotel franchise systems that operate under names or marks other than "RAMADA" or the Ramada System. Nothing herein shall be construed to prevent Ramada from using a common reservation system, franchise application procedure and/or committee, marketing and advertising programs, administrative personnel, central purchasing, approved supplier lists, franchise marketing personnel (or independent franchise sales representatives), etc, for the benefit of other hotel systems affiliated with Ramada.

10.    System Standards. Ramada shall have the right to control and establish requirements for all aspects of the System. Licensee shall comply with all System Standards (as embodied in the System Standards Manual(s) or otherwise), as amended, supplemented or replaced. Without limiting the foregoing:

(a)    Specification. Ramada may from time to time specify System Standards in any manuals, policy statements or revisions as Ramada adopts, including without limitation, standards relating to: (i) design for new, upgraded or modified facilities, including all aspects of Facility design, minimum number of rooms, rooms mix and configuration, construction materials, landscaping, amenities, interior decor and the like ("Design Standards"); (ii) furniture, fixtures, equipment and supplies ("FF&E Standards"); (iii) interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere ("Mark Standards"); (iv)

-7-

cleanliness, maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations ("Operations Standards"); and (v) communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, rooms management, records maintenance, marketing data, accounting, budgeting and the Reservation System ("Technology Standards"); (vi) replacement of FF&E, decor, and other capital items and design materials ("Maintenance Standards"), and any other standards relating to System operation and usage, all of which Licensee shall meet, at its sole expense. Licensee acknowledges that Ramada may, in its sole discretion, permit deviations from System Standards, based on local conditions and/or Ramada's assessment of special circumstances.

      (b)   Inspections.  Ramada has the unlimited right to conduct unannounced inspections of the Facility and its operations, records and Mark usage up to four (4) times per year both prior to and during the License Grant Term, to ascertain Licensee's compliance with System Standards and this Agreement and, in addition, the unlimited right to reinspect in the event of a failed inspection. Licensee shall pay the travel, lodging and meal expenses of Ramada's representatives if reinspection of the Facility is required due to Licensee's failure to meet System Standards at any prior inspection. Licensee acknowledges that all inspections are solely for the purposes of ascertaining compliance with System Standards and not to ascertain Licensee's compliance with any federal, state or local laws, regulations or code requirements applicable to the Facility. Neither Ramada, its affiliates, nor their representatives, agents or contractors assumes any responsibility or liability to Licensee, its lenders, contractors, employees, guests or others by reason of such inspections or approvals.

      11.  Reservation System.  Ramada will maintain (directly or by subcontracting with one or more third parties) a computerized central reservation system and/or such technological substitute(s) as Ramada determines, in its sole discretion (the "Reservation System"). Licensee will, during the License Grant Term, participate in the Reservation System and comply with all related System Standards including, without limitation, standards for (i) purchase or lease and maintenance of computer/teletype terminal equipment, communications equipment and service, and/or computer hardware and software and (ii) honoring prepaid, confirmed, guaranteed and other reservations for the Facility accepted through the Reservation System. Because of the extreme importance of maintaining Reservation System standards and Reservation System-related proprietary information and technology, Licensee acknowledges that Ramada may, in its sole discretion, require Licensee to lease, license or otherwise acquire the right to use Reservation System computer software and other technology directly from Ramada and/or its affiliates, pursuant to separate written agreements containing such terms, conditions and prices as reasonably determined by Ramada from time to time. Ramada shall also have the option to require that Licensee obtain Reservation System-related computer hardware only from third party sources then included on the Approved Supplier List described in Section 16 hereof. Licensee shall not use information obtained through the Reservation System to refer guests, directly or indirectly, to any non-System hotel. Licensee shall be solely responsible for and shall indemnify and hold Ramada harmless against overbooking of its guest rooms, through the Reservation System or otherwise. Licensee shall pay all Facility telephone line connection charges, supply

costs and other expenses of participating in the Reservation System. Ramada may pay travel agents' commissions, fees charged by airline or cruise ship line reservation services or other similar fees attributable to reservations for the Facility booked through the Reservation System, and Ramada shall receive reimbursements of such payments, together with a reasonable service or handling charge, from Licensee within thirty (30) days after the date of any invoice therefor. Licensee may be suspended from the Reservation System for any default of this Agreement. Ramada may, in its sole discretion, also discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert to other System hotels reservations made after the effective date of such notice and until such suspension has been rescinded. Reservation service shall only be restored after Licensee has fully cured any defaults or successfully passed a quality assurance reinspection. Licensee waives all claims against Ramada or subcontractors arising from any removal of the Facility from the Reservation System under this Section 11. Notwithstanding anything to the contrary contained in this Agreement, Ramada shall have the right to provide reservation services to non-System properties or other lodging systems, provided that such provision of services does not result in a direct increase of costs to System licensees.

12. **Marketing**.

(a)  <u>Use of Marketing and Reservation Assessments</u>. Ramada will, in its sole discretion, use Marketing and Reservation Assessments to promote public awareness and usage of System hotels by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of RAMADA System publications and Directory of hotels, for reservation programs and for the operation of reservation centers and central computers, including related support functions. Ramada shall have sole discretion regarding (i) the nature and type of media placement; (ii) the allocation (if any) between international, national, regional and local markets; and (iii) the nature and type of advertising copy and other materials and programs. Marketing assessments may be used by Ramada in whole or in part to reimburse Ramada's reasonable direct and indirect costs, overhead or other expenses of providing marketing services.

(b)  <u>Special Advertising Programs</u>. Ramada may, at its sole discretion, implement "Special" and/or non-recurring international, national, regional or local System promotional programs (which may or may not encompass the Facility) and may make available to Licensee (to use at its expense in local advertising (at Licensee's option) or participation in Special programs) media advertising copy and other marketing materials for prices which reasonably cover Ramada's direct and indirect costs.

(c)  <u>Group Booking Programs</u>. Ramada, may, at its sole discretion, implement "Group Booking" programs created to encourage use of System hotels for tours, conventions and the like. Ramada reserves the right to charge separate fees in addition to the Marketing and Reservation Assessments for any resulting Group Booking accepted at the Facility.

(d)  <u>Licensee Advertising</u>. Licensee shall (at its expense, but subject to Ramada's prior approval) implement a pre-Opening Date local advertising program. Thereafter, Licensee may implement (at its option and expense) its own local advertising. All Licensee implemented advertising

materials must comply with System and Mark Standards and be approved in writing by Ramada prior to publication. Ramada shall have the right to compel Licensee to discontinue any previously approved advertising materials.

(e)    Licensee Co-operation.

(i)    Ramada shall publish a System Directory which shall include, at a minimum, the names and addresses of System hotels. Licensee shall comply with procedures established from time to time in the System Standards Manual and/or policy statements pertaining to the Directory. Licensee shall not charge any party more than the applicable rate(s) as published from time to time in the then current System Directory, unless Ramada has consented in writing (due to special circumstances). Ramada shall supply System Directories to Licensee and Licensee shall display the current System Directory in each Facility guest room, and at such other locations within the Facility as are specified in the System Standards Manual and/or policy statements.

(ii)    Licensee shall participate, at its expense and to the extent permitted under applicable law, in all System regular and special marketing programs designated as mandatory and cooperate with special promotional and discount programs, optional marketing programs, market research programs, and the display and use of System brochures and promotional materials.

13.    **Training**.    At least thirty (30) days prior to the projected Opening Date, Licensee's representative (normally, the general manager) must complete to Ramada's satisfaction a "Manager Training Program" (at Ramada's discretion as to duration). At least thirty (30) days prior to the Opening Date, Licensee representatives who will have responsibility for training Facility employees shall attend a "Designated Trainer Program". If Licensee adds or replaces any Facility general manager, it shall (at Licensee expense, including reasonable tuition) send each such new manager to a Manager Training Program, to the extent practicable at least sixty (60) days prior to assuming Facility duties, but in no event later than six (6) months after employment. Ramada may conduct, from time to time, special training sessions and require attendance of designated Licensee employees. Most Training will be offered by the Ramada Management Institute, of Phoenix, Arizona, at locations designated by Ramada. Ramada may charge tuition for optional training (including training at mandatory sessions of persons in excess of those required by Ramada to receive such training). Licensee shall bear all travel, lodging, food and other out-of-pocket attendance expenses of its orientation and training program attendees, and of Ramada's designees if conducted at the Facility.

14.    **Insurance and Indemnity**.

(a) **Insurance Requirements**. During the License Agreement Term and for a period of not less than six (6) months after the termination of this Agreement, Licensee will secure and maintain comprehensive general liability insurance on an occurrence basis per location (with contractual and product liability, completed operations, independent contractors and escalator coverage), providing protection for personal injury, bodily injury and property damage with combined single limits of not less than Five Million Dollars ($5,000,000.00) per occurrence. The Licensee shall name Ramada and

its affiliates, (including its parent and any subsidiaries) as additional insureds. The types, forms and amounts of insurance required may be changed, modified or increased by Ramada as it deems necessary. In addition to comprehensive general liability insurance, Licensee agrees to secure and maintain:

> (i) comprehensive automobile liability insurance in the form and amounts set forth above;

> (ii) employer's liability and worker's compensation insurance as prescribed by applicable law;

> (iii) dram shop and/or liquor legal liability, if the facility is in a jurisdiction having a Dram Shop Act;

> (iv) fire, extended coverage, vandalism and malicious mischief insurance, insuring the construction, improvements and completed buildings comprising the Facility for no less than 80% of the full insurable replacement cost thereof; and

> (v) all insurance required under any lease or mortgage covering the Facility.

(b) <u>Construction Period</u>. In connection with all significant construction at the Facility during the Term, Licensee will cause the general contractor to maintain comprehensive general liability insurance (with products, completed operations and independent contractors coverage) in an amount of not less than Five Million Dollars ($5,000,000.00).

(c) <u>Annual Renewals</u>. Simultaneously with the execution of this Agreement, annually thereafter, and each time a change is made in any insurance policy or insurance carrier, Licensee will furnish to Ramada, a certificate of insurance evidencing the insurance coverages in effect, the named insured and additional insureds, and endorsed with a statement that the coverage may not be cancelled, altered or permitted to lapse or expire without thirty (30) days advance written notice to Ramada. In the case of comprehensive general liability insurance, comprehensive automobile insurance, dram shop or liquor liability insurance, and the general contractor's comprehensive general liability insurance, Ramada and its affiliates (including its parents and subsidiaries) shall be named as additional insureds.

(d) <u>Policy Requirements</u>. All policies required by this Agreement shall be written by insurance carriers rated "A" or better by A.M. Best and approved by and satisfactory to Ramada and said carriers shall be authorized to do business in the jurisdiction in which the Facility is located. All policies shall provide that the insurer waives any right of subrogation against Ramada. The original insurance policies and certificates of insurance shall name Ramada and its affiliates, (including its parent and any subsidiaries) as additional insureds.

(e) <u>Indemnity</u>. Licensee will indemnify Ramada and its affiliates (including parents and subsidiaries) against, hold it harmless from, and promptly reimburse it for any and all payments of money (fines, damages, legal fees, expenses) arising out of any demand, claim, tax, penalty, administrative or judicial proceedings, or actions relating to any claimed

-11-

occurrence at the Facility (even where Ramada's negligence is alleged) and any act, omission or obligation of Licensee or anyone associated or affiliated with Licensee or the Facility. Unless covered by Licensee's insurance, there shall be excluded from this indemnification any final judgment rendered against Ramada, wherein Ramada has been found negligent but only the amount based on Ramada's negligence shall be excluded from this indemnification. Without limiting the foregoing, this indemnification specifically includes any claims or actions by third parties arising out of Licensee's execution of this Agreement or operation of the Facility under the Ramada name. Licensee waives any right of recovery against Ramada for any direct or indirect loss arising out of any occurrence at the Facility.

In the event that Ramada is required to respond to any claim, action, demand or proceeding relating to Licensee's facility, Licensee will, at Ramada's election, respond and defend Ramada and its affiliates (including parents and subsidiaries) against such claims and demands in any such actions or proceedings. In the event that Licensee fails to defend Ramada when requested, Licensee will reimburse Ramada for all costs and expenses, including attorney fees, incurred by Ramada. Regardless of Licensee's obligation to indemnify and defend under this Section, Ramada has the right, through counsel of its choice, and at Licensee's expense to control any matter to the extent said matter could directly or indirectly adversely affect Ramada. The obligations of Licensee pursuant to this subsection (e) shall survive termination of this Agreement.

## 15. Ramada Inter-National Association.

(a) Trade Association. Upon execution of this Agreement, Licensee automatically becomes a member of Ramada Inter-National Association ("RINA"), an unincorporated association. Other Licensees of the System and Ramada are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to Ramada regarding such issues and other matters, such as advertising and revisions of the System Standards.

(b) Conferences. Ramada may conduct, from time to time, a franchise conference. Conference location and date will be selected at the sole discretion of Ramada. If a conference is held, Ramada shall charge a Conference Fee based upon the greater of the number of Licensee attendees or Licensee Facilities. Upon payment of the Conference Fee, Licensee may send its representative(s) to the Conference. Additional Facility representatives may attend subject to conference policies and Ramada's right to limit number of attendees, and after payment of any additional Conference Fees.

16. Approved Supplier Lists/Central Purchasing. Ramada shall have the right, in its sole discretion, to designate services or products of third party suppliers as "Approved," and maintain an "Approved Supplier List" of such suppliers and, in general, such designation shall constitute acknowledgment of compliance with System Standards. Ramada reserves the right to designate on the Approved Supplier List products and services which are not then subject to System Standards and also to offer products and services for sale or lease through Ramada or Ramada affiliates. Licensee is not obligated to purchase non-Mark-bearing products or services which otherwise meet System Standards from Approved Suppliers; however, Mark-bearing items shall be purchased only from Approved Suppliers. Ramada will publish in its System

Standards Manual procedures by which Licensee-selected sources of Mark-bearing and non-Mark-bearing products and services can become Approved. Such procedures shall include the inspection and testing of products and services covered by System Standards and utilized at the Facility, but purchased or acquired by Licensee from sources not on the Approved Suppliers List. Any contract (including its prices, terms and conditions) which results from Approved Supplier Lists shall be strictly between the Approved Supplier and Licensee; and neither Ramada nor any of its affiliates shall be deemed to be a seller, distributor, title-holder or warrantor of any products or services so purchased or guarantor of the purchase price or other terms and conditions of any such products or services. RAMADA, FOR ITSELF, AND ITS AFFILIATES, DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES CONCERNING SYSTEM-APPROVED PRODUCTS OR SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AVAILABILITY, QUALITY OR PRICING OR PROFITABILITY. Licensee acknowledges that Ramada may receive fees, commissions, field-of-use license royalties, or other consideration from Approved Suppliers based on sales to System Licensees, and that Ramada may charge non-Approved Suppliers reasonable testing or inspection fees.

17.  **Additional Licensee Duties**.

(a)  Best Efforts.  Subject to applicable law, Licensee will exercise best efforts to (i) maximize the good will, guest satisfaction and usage of the System and the Facility and to recommend and promote all other System hotel activities; (ii) provide Facility guests complimentary items and services as Ramada from time to time specifies in the System Standards Manual or policy statements, to the extent permitted by applicable law, (iii) maintain sufficient working capital and maintenance and renovation reserves to fulfill its obligations pursuant to this Agreement; and (iv) not permit its employees, representatives, or guests to engage in conduct which is unlawful or damaging to the good will of the System.

(b)  Food, Beverage and Other Services.  Licensee shall operate only the approved Food and Beverage and other services as shown on Schedule B for the License Grant Term, unless it first obtains Ramada's written consent to add to, modify or discontinue such services. Licensee shall obtain Ramada's written consent before entering into any subcontract or lease with third parties for Food and Beverage and other so-called "concession" services at the Facility, provided that subcontracted or leased services shall be subject to System Standards and insurance requirements as set forth in the System Standards Manual. For purposes of this Agreement, "Food and Beverage" service shall include any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

(c)  Compliance with System.  During the License Agreement Term, Licensee will do all of the following:  (i) maintain a high moral and ethical standard of operation at the Facility; (ii) comply with all governmental laws and requirements, pay all taxes; and maintain all governmental franchises and permits necessary for operation of the Facility in accordance with the System; (iii) maintain the Facility in a clean, attractive and orderly condition, using standards established by Ramada applicable to hotels in the System; (iv) provide efficient, courteous and high-quality service to the public in accordance with the System; (v) operate the Facility continuously and in strict compliance with the System; (vi) provide Ramada's training

-13-

representatives with free lodging when conducting training at the Facility' (vii) advertise and promote the Facility on a local or regional basis subject to Ramada's approval as to form and content; (viii) promote only other hotels in the System; and not promote any competing business; (ix) comply with Ramada's reasonable requirements so that the quality of equipment and supplies in the Facility meet the standards and specifications of the System; (x) display outdoor signs and other signs, promotional material and identifying characteristics as approved and required by Ramada and used in the System; (xi) recognize and accept for customer credit all credit or consumer debit cards approved by Ramada from time to time, and require all licensees at the Facility to do likewise; (xii) otherwise comply with Ramada's requirements and specifications as to the services and products to be used promoted or offered at the Facility; and (xiii) otherwise use all reasonable means to promote and encourage the use of RAMADA hotels, facilities and reservation centers everywhere by the public and use Licensee's best efforts to create and maintain good-will among the public toward the name "RAMADA" and toward the System.

(d)    Minor Renovations.  In addition to Licensee's obligations pursuant to Sections 2, 9 and 10 hereof, on and after the third anniversary of the Opening Date, and not more often than the third anniversary of the date of any prior written Minor Renovation Notice, Ramada may issue Licensee a written "Minor Renovation Notice."  Such notice shall be given at least sixty (60) days in advance of the commencement date specified in such notice.  Such notice will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation"), having an aggregate cost for labor, FF&E and materials estimated by Ramada to be not more than the "Minor Renovation Ceiling Amount" as provided in Section 17(f) below.  On or prior to the commencement date specified in such Notice, Licensee shall commence such Minor Renovations and shall complete such renovations promptly as practicable.

(e)    Major Renovations.  In addition to any Minor Renovations or other renovations required by Ramada to correct any Facility failure to meet System Standards, Ramada may, not more than twice during the License Grant Term and not earlier than the seventh anniversary of the Opening Date, issue Licensee a written "Major Renovation Notice."  Such Notice shall be given at least 120 days in advance of the required commencement date, and shall specify the Facility "Major Renovation" requirements, which may include structural changes, additions to and modifications of facilities, and which requirements shall have an aggregate cost for design, labor, FF&E and materials estimated by Ramada to be not more than the "Major Renovation Ceiling Amount" as provided in Section 17(f) below, which renovations are necessary, in Ramada's sole discretion to enable the Facility to continue to meet System Standards. Licensee shall, unless it opts to exercise its Section 21 termination rights and pay any required amounts, comply with the Renovation Obligation by the "Completion Date" specified in the foregoing Major Renovation Notice. Licensee will not be required to commence the second Major Renovation prior to the fifth anniversary of the date the first Major Renovation is completed. Licensee may not operate the Facility under the System after the Completion Date (or such later date as the parties in writing agree) until Ramada certifies in writing that Licensee has completed the Major Renovation.

(f)    The Minor Renovation Ceiling Amount shall be the product of $500.00 multiplied by the number of guest rooms in the Facility.  The "Major Renovation Ceiling Amount" shall be the product of $2,000.00 multiplied by the

-14-

number of guest rooms in the Facility. Both the Minor Renovation Ceiling Amount and the Major Renovation Ceiling Amount will be subject to adjustment each January 1 beginning on January 1, 1992; provided, however, that Ramada shall make such adjustment on a system-wide basis and that Ramada shall notify the Licensee of such adjustment at least thirty (30) days prior to the effective date of such adjustment; and provided, further, that no such adjusted Ceiling Amount shall exceed the amount obtained by multiplying the applicable Ceiling Amount by the Adjustment Factor. Ramada's computation of either the Minor Renovation Ceiling Amount or the Major Renovation Ceiling Amount shall be binding and conclusive in the absence of manifest error.

(g)   Hotel Modifications.  Licensee will not materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) without Ramada's prior written consent. Licensee shall pay Ramada's then current "Rooms Addition Fee" for each additional guest room which, at the time this Agreement is executed, is $300.00 per additional guest room for any room increases over 100 rooms. Licensee shall obtain Ramada's prior written approval of the plans and specifications for such additions before commencing construction. No rooms or facilities addition or material modification of existing facilities, even though previously approved in concept, shall be opened to the public until Ramada inspects and certifies in writing that they meet System Standards.

(h)   Courtesy Lodging.  Licensee shall provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to Ramada employees and representatives traveling on business, but shall not be obligated to provide more than three standard guest rooms for such purpose at the same time.

18.   Representations, Warranties and Covenants.  The parties disclaim any representation, covenant, or warranty, express or implied, including validity or registrability of any Mark, the tax consequences or potential profitability of the transactions contemplated by this Agreement, or the value or quality of any services or products purchased by Licensee in furtherance of this Agreement, except as expressly set forth in this Agreement, and except that Licensee expressly represents, warrants and covenants to Ramada as follows:

(a)   Quiet Enjoyment.  Licensee is and will continue to be entitled to possession of the Facility during the entire License Agreement Term without restrictions that would interfere with its performance under this Agreement.

(b)   Expertise.  Licensee has or will employ persons or management firms approved, with the necessary management expertise and experience to design, construct, acquire, develop, equip, operate, market, maintain, and manage the Facility.

(c)   Assumes Risk.  Licensee has received, at least 10 business days prior to execution of this Agreement, read and understood Ramada's current FRANCHISE OFFERING CIRCULAR FOR PROSPECTIVE FRANCHISEES (which circular includes a copy of the form of this Agreement), and has had ample opportunity to consult with its advisors. It has independently investigated the risks of the transactions contemplated hereby, and either (i) has

substantial prior experience in the construction and operation of hotels and/or motels, or (ii) has obtained, relies with confidence upon, and acknowledges that Ramada does not warrant the validity of (even if obtained at Ramada's request), advice of third party representatives with such prior or similar experience, and/or a positive market feasibility study for the Facility from a nationally prominent independent accounting or consulting firm. Licensee acknowledges that the reasons for termination under Sections 7 and 21 constitute good cause, and that the notice provisions relating thereto constitute reasonable notice.

(d)  <u>Laws and Taxes</u>.  The Facility will be constructed and operated in compliance with all local, state and federal laws, ordinances, rules and regulations.  Licensee will certify from time to time, as Ramada may reasonably require, that it is in compliance with all applicable laws and regulations, and has obtained and maintained all necessary licenses and permits.  Licensee will file all required tax returns and pay when due all required taxes.

(e)  <u>Authority</u>.  Licensee has full power and authority and has been duly authorized, to enter into and perform its obligations under this Agreement, all necessary approvals of any Board of Directors, shareholders, partners, co-tenants and lenders having been obtained.  The execution, delivery and performance of this Agreement by Licensee will not violate, create a default under or breach of any charter, bylaws, agreement, indebtedness, certificate, order, decree or security instrument to which Licensee or any of its principals is a party or is subject or to which the Facility is subject.  Licensee or the Facility is not the subject of any current or pending dissolution, receivership, bankruptcy, reorganization, insolvency, or similar proceeding on the date this Agreement is executed by Ramada and was not within the three years preceding such date, except as disclosed in the Application.  The persons signing this Agreement on behalf of Licensee personally represent and warrant to Ramada that they are authorized to execute this Agreement and any other agreement with Ramada for and on behalf of Licensee and have full authority to so bind Licensee.

(f)  <u>No Misrepresentations</u>.  Licensee and its representatives have full power to enter into this Agreement.  All written information provided to Ramada about the Facility, or the Licensee, the principal owners Licensee, any guarantor, or the finances or any such persons or entities, was or will be at the time delivered, true, accurate and complete, and such information contained no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances in which it is disclosed.

19.  <u>Ramada: Assignments and Subcontracts</u>.  Ramada may assign or subcontract all or any part of its rights and duties under this Agreement, including by operation of law, without notice and without Licensee's consent.

20.  <u>Licensee: Assignments, Transfers and Conveyances</u>.

(a)  <u>Consent Required</u>.  This Agreement is personal to Licensee.  Licensee shall not lease or sublease the Facility to any third party, and will not, directly, indirectly, by operation of law or pursuant to several related transactions assign, transfer, convey, or pledge, except to a "Permitted Transferee" or with Ramada's prior written consent (which may be withheld or

conditioned, in its sole discretion):

(i)  any rights under this Agreement;

(ii)  30% or more of the equity interests in Licensee from the persons and amounts shown on Schedule B;

(iii)  any lesser percentage of Licensee's equity that constitutes effective control of Licensee;

(iv)  any rights, duties or interests of any general partner of Licensee, if Licensee is a general or limited partnership, including the admission of any substituted or additional general partner; or

(v)  any interest in the legal or equitable title to the Facility, or if leased to Licensee as lessee, the lessee's leasehold interest in the Facility.

(b)  Interests.  The term "equity interests" shall include, without limitation, all forms of voting stock interests, general partnership interests, limited partnership interests and all options, warrants, and instruments convertible into conventional equity interests.  If Licensee is a corporation, Licensee shall not, except with Ramada's prior written consent (which may be withheld or conditioned in its sole discretion) merge, consolidate or issue additional stock in Licensee in a transaction which would have the effect of diluting the prior Licensee owners' combined interests in the surviving entity to less than 51%.

(c)  Registered Securities.  If at least the majority of the equity securities of Licensee (or a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling Licensee), are registered under the federal Securities Act of 1933, as amended, or are a class of securities registered under the Securities Exchange Act of 1934, as amended, or are listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), then such registered equity securities shall be freely transferable without the application of this Section 20 except in a single transaction or a series of related transactions involving the transfer of more than 20% of the outstanding equity securities of Licensee (other than repurchase directly or indirectly, by Licensee).

(d)  Conditions.  Ramada may, to the extent permitted by applicable law, condition its consent under this Section 20 upon the receipt of general releases from the assignor and each of its owners, the payment of the then current transfer Application Fee and Initial Fee, execution of the then current System license agreement or an assignment and assumption agreement provided by Ramada, upgrading of the Facility to meet System Standards then in effect (even if such upgrading costs exceed the Major Renovation Ceiling Amount), and payment of all amounts then owed Ramada and its affiliates by Licensee under this Agreement or otherwise.

(e)  Permitted Transferee.  A "Permitted Transferee" shall be any natural person(s) receiving the Licensee equity interest transferred without consideration by will, trust or intestate succession (but not by gift or by divorce settlement or decree), provided that such Permitted Transferee(s)

-17-

agrees, in writing, to be bound by this Agreement or, at Ramada's option, the License Agreement form then used for new licensees.

(f) <u>Attempted Transfers</u>. Any attempted transfer, lease, sublease, assignment or pledge which is not in accordance with this Section 20 shall be void and shall give Ramada the right to terminate the License and exercise other rights and remedies, including those under Sections 21 and 22, and until such termination Licensee shall nevertheless continue to be liable for Recurring Fees.

(g) <u>Ownership Changes</u>. Licensee shall give Ramada at least 30 days prior written notice of the terms and conditions of any conveyance requiring Ramada's consent, and shall notify Ramada within 30 days thereafter of a transfer to a Permitted Transferee, under this Section 20. In addition, Licensee will notify Ramada in writing at least 30 days in advance of the occurrence of any change, through a single or series of related transactions, of (i) 20% or more of the beneficial ownership of Licensee, or (ii) any percentage of the ownership of the Facility, if not owned by Licensee. If Licensee is a partnership or joint venture, it will promptly notify Ramada of the death or unplanned retirement of any general partner and/or any cumulative change of 20% or more in the right to receive distribution of Licensee's profits and losses. Licensee shall, from time to time, but only if Ramada so requests, provide Ramada with lists of the equity owner(s) of Licensee and/or the Facility, and their respective interests.

(h) <u>First Refusal Rights</u>. Upon Licensee's receipt of any bona fide "Third Party Offer" to consummate a transaction requiring Ramada's consent under subparagraph (a)(v) of this Section 20, the Licensee shall so advise Ramada in writing (including the terms and conditions of such Third Party Offer) within 10 days of Licensee's receipt of such Third Party Offer. Ramada (or any affiliate) shall have the right and option, exercisable by sending written notice of exercise by the fifteenth business day following receipt of such notice, to purchase the Facility (or leasehold, if applicable) on the same terms and conditions as set forth in such notice provided that Ramada shall not be responsible for payment of any finders or brokerage fees, or for any non-cash or non-purchase price terms of such Third Party Offer. If either a like kind exchange within the meaning of Section 1031, or a reorganization within the meaning of Section 368(a)(1)(A) or (B), both Sections of the Internal Revenue Code of 1986, as amended, is contemplated with respect to all or part of such Third Party Offer, Ramada may elect to pay in cash an amount equal to the fair market value of the offeror's property or securities to be exchanged or issued (as determined by an appraiser selected solely by Ramada) offered by the third party. Any change in such terms or such purchaser, or any failure to complete such sale within 6 months after the date Licensee gives such notice to Ramada, shall be treated as a new offer, entitling Ramada to new first refusal rights. Licensee shall, if Ramada so requests, execute such documents as Ramada deems necessary or desirable, or Ramada may file its affidavit, including all or parts of this Agreement, to record Ramada's first refusal rights against the Facility.

(i) <u>Management</u>. Licensee shall give Ramada not less than thirty (30) days prior written notice of any agreement with a management company relating to the management of the Facility, and Ramada shall promptly notify Licensee if there is an objection to such agreement. Licensee shall not enter into any such agreement to which Ramada expresses an objection without

receiving from Ramada a written withdrawal of such objection. If Licensee does not receive an objection from Ramada within thirty (30) days after notice of such agreement has been delivered, Ramada shall be deemed to have waived any objection.

21.  Termination.

(a)  Licensee Termination.  If Ramada gives Licensee a Major Renovation Notice, Licensee may (in lieu of undertaking the Major Renovation) terminate the License by giving Ramada at least 90 days prior written notice of the termination date and tendering with such notice a "Termination Fee" equal to 100% of Licensee's aggregate Recurring Fees which accrued with respect to the Facility during the 18 full months immediately preceding the giving of such notice by Licensee but not less than $1,500.00 per guest room. The $1,500.00 figure is subject to adjustment on each January 1 commencing January 1, 1992, on a system-wide basis, but such adjusted figure shall not exceed such amount multiplied by the Adjustment Factor.

(b)  Ramada Termination With Notice.  Ramada may terminate this Agreement at any time, effective upon the date specified in the termination notice (or the earliest date permitted by applicable law) if: (i) Licensee fails to submit monthly reports then due under Section 8(b) within 10 days after receipt of Ramada's written demand; (ii) Licensee fails to pay any amount then due to Ramada under this Agreement or otherwise within 10 days after receipt of Ramada's written payment demand; (iii) Licensee fails to remedy any other breach of its obligations or warranties under this Agreement within 30 days (5 days for breach of Section 9(f)) after receipt of written notice from Ramada specifying one or more breaches of this Agreement, or such longer time as Ramada may in writing allow; (iv) Licensee loses possession of or the right to possess all or a significant part of the Facility; (v) Licensee defaults in the performance of the terms and conditions of any other agreement with, Ramada or its affiliates, or any mortgage, deed of trust or lease covering the Facility, and fails to cure such default within the time permitted by the applicable instrument; (vi) Licensee knowingly maintains false books or records, or knowingly submits any false report to Ramada; (vii) Licensee fails to pay its debts generally as they fall due; (viii) Licensee makes or made any misstatement or omission of any material fact in connection with this Agreement or its license application; or (ix) Licensee fails to deliver within 60 days after the execution and delivery of this Agreement any other agreement with Ramada or any other document, deed, instrument, certificate or writing relating to Licensee (including its owners, partners, officers, directors or finances), the Facility, or this Agreement requested by Ramada in writing at or prior to execution of this Agreement by Ramada, provided that Ramada may exercise its right to terminate under this clause whether or not the License Grant Term commences, but may not exercise this right after Licensee delivers all such required materials. In any judicial proceeding in which the validity of termination is at issue, Ramada will not be limited to the reasons set forth in any notice sent under this Section.

(c)  Ramada Termination without Notice.  Ramada may, in its sole discretion, immediately terminate this Agreement, without notice (or at the earliest time permitted by applicable law) if: (i) Licensee violates or suffers a violation of Section 20; (ii) the Facility ceases to be operated under the System after the Opening Date (except as permitted herein); or (iii) Licensee contests in any court proceeding the ownership of or Ramada's right

-19-

to license the System or any part of it, or the validity of any of the Marks. This Agreement shall automatically and immediately terminate without notice if any involuntary proceeding in bankruptcy is filed against the Licensee which is not dismissed within 60 days of filing, any voluntary proceeding in bankruptcy is filed by Licensee, Licensee is dissolved or liquidated, a receiver is appointed for Licensee or the Facility, or Licensee makes any assignment for the benefit of creditors.

(d)  Casualty and Condemnation.  If the Facility suffers destruction or significant damage by act of God or other event beyond Licensee's reasonable anticipation and control such that the Facility cannot continue to be operated in the normal course of business, (with at least 75% of guest rooms and parking available for public lodging)(a "Casualty"), Licensee shall promptly notify Ramada in writing of such Casualty, giving information as to the availability of guest rooms and the Facility's ability to honor advance reservations.  Licensee shall advise Ramada in writing within 30 days after the Casualty whether it will restore, rebuild and refurbish the Facility to again comply with the Approved Construction Plans, which must be completed within 180 days after the Casualty, or it elects to terminate the License, effective as of the date of notice.  Licensee's failure to make such an election within the time permitted shall be deemed an election to terminate this Agreement.  Any termination under this paragraph shall require payment of a Termination Fee as set forth in Section 21(a) and Licensee shall follow the post-termination requirements in Section 23.  Once undertaken, Licensee's failure to complete the restoration of the Facility on time or to pursue the same diligently shall permit Ramada to terminate this Agreement under Section 21(b).  If the Facility is condemned, or such a substantial portion of the Facility shall be condemned such that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or the Facility or the substantial portion is sold to the condemning authority in lieu of Condemnation (each, a "Condemnation"), then the License will be deemed terminated on the date the Facility or substantial portion is conveyed to or taken over by the condemning authority.  No Section 22 Liquidated Damages will be owed by Licensee in the event of such Condemnation if Licensee notifies Ramada about the Condemnation within 10 days after it receives formal notice from the condemning authority and then pays Ramada all amounts due under this Agreement or otherwise within 30 days after the deemed termination date.

(e)  Non-Waiver.  Termination of this Agreement by Ramada or Licensee does not waive any Licensee obligation for accrued, unpaid Recurring Fees (including interest) or other liabilities and obligations arising out of any acts or omissions of Licensee prior to the effective date of termination; and does not waive any obligations of the Licensee to perform all applicable provisions of this Agreement after such termination.  Ramada reserves all rights at law or in equity, whether or not Ramada first terminates this Agreement, including without limitation the right to collect from Licensee by suit or otherwise all amounts due and to remove the Facility from the Reservation System.

22.  Liquidated Damages.  If this Agreement terminates by action of the Licensee or under Section 21(b) or (c), Licensee shall pay Ramada within 30 days following the date of such event, as "Liquidated Damages", because actual damages incurred by Ramada will be difficult or impossible to ascertain, and not as a penalty, an amount equal to the sum of accrued

Recurring Fees during the immediately preceding 24 full calendar months (or such shorter period as equals the unexpired License Grant Term at the date of termination, without regard to any express right to terminate the License prior to the expiration of the License Grant Term); provided, however, if the Facility has been open for less than 24 months, then the average monthly Recurring Fees since the commencement of the License Grant Term multiplied by 24, plus any applicable Taxes assessed on such payment.  Notwithstanding the foregoing, in no event shall the amount payable pursuant to this Section be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility, provided, however, if the License Grant Term will expire in less than 24 months, then such amount shall be reduced by multiplying it by a fraction, the numerator of which is the number of months remaining in the License Grant Term and the denominator of which is 24.  If the License Agreement terminates prior to the Opening Date, Licensee shall pay Ramada within 30 days following the date of termination Liquidated Damages in an amount equal to the product of $500.00 multiplied by the number of Facility guest rooms, plus any applicable Taxes.  The $2,000.00 and $500.00 factors shall be adjusted each January 1, beginning January 1, 1992, on a system-wide basis, provided that no such adjustment shall exceed the amount resulting by multiplying such amount by the Adjustment Factor.  Payment of Liquidated Damages shall be in addition to Ramada's other rights under this Agreement.

23.  **Licensee Duties At and After Termination**.  Upon termination of this Agreement for any reason whatsoever:

(a)  **System Usage Ceases**.  Licensee shall immediately cease all use of the System, including all Marks and Mark-bearing menus, supplies, signage, stationery, FF&E, and other personalty, return all originals or copies of any System Standards Manual(s), policy statements or other Confidential Information referred to in Section 9(f), and comply with any post-termination procedures specified in the System Standards Manual. Licensee shall promptly cancel any assumed or fictitious name filing which includes any Mark.  Licensee shall immediately direct all telephone companies, travel agents, travel directories and other organizations which identify Licensee's Facility as a Ramada, to cease, effective with their next published edition, all references to the Facility as a Ramada and, at the request of Ramada, shall provide Ramada with written confirmation from such third parties of receipt of such direction.  Any post-termination mark usage by Licensee shall be a willful infringement of FSH's and Ramada's trademark and other rights.

(b)  **Other Ramada Remedies**.  Ramada (or its representatives) may immediately remove the Facility from the Reservation System and divert reservations as set forth in Section 11.  Ramada may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove equipment of Ramada, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates) not removed or obliterated by Licensee on or before the effective date of License termination.  Ramada's cost of removing signage will be promptly paid or reimbursed by Licensee, and will be added to the amounts of accrued and unpaid Recurring Fees and other amounts to be collected from Licensee, net of the $10.00 purchase price for such signage. Licensee, upon receipt of Ramada's written request, shall, at Licensee's sole expense, change any distinctive Facility architectural, trade dress or design features which might lead the public to believe that the Facility is still

-21-

affiliated with the System. Ramada shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off the aggregate purchase price thereof against any sums then owed Ramada by Licensee. Ramada shall exercise reasonable care in removing and/or painting over signage, but shall have no obligation or liability to restore or repair damage to the Facility premises or equipment. Ramada may give notice to any lessor of Mark-bearing signage or other items to remove such signage and items and terminate the lease obligation of Licensee.

(c) <u>Advance Reservations</u>. Licensee will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made.

(d) <u>Survival of Certain Provisions</u>. Licensee's duties and Ramada's rights under Sections 6(c), 8(a), 9(a)-(h), 14(e), 18(a)-(f), 21(e), 22 and 28 as well as all provisions of this Section 23, shall survive termination of this Agreement, whether termination is automatic or initiated by Ramada or Licensee, and even if such termination is wrongful.

24. <u>Relationship of Parties</u>. Licensee is an independent contractor. Neither party is the legal representative or agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever, and no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

If this Licensee shall be any two or more persons and/or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits granted herein may only be exercised and enjoyed jointly; the liabilities and responsibilities hereunder assumed, however, shall be the joint and several obligations of such persons or entities.

Except as otherwise expressly stated in this Agreement, the parties recognize the Licensee exercises full and complete control over and has full responsibility for its labor relations and employment practices and policies, including, but not limited to, the hiring, disciplining, firing, compensation and work rules and schedules of its employees.

25. <u>Recording</u>. The parties agree that this Agreement shall not be recorded in its entirety in any recording office unless the recording of the Agreement in its entirety shall be required by applicable law, in which event a duly and fully executed counterpart copy of this License Agreement, in recordable form, shall be forthwith recorded in the appropriate recording office at the expense of Licensee.

In the event that this Agreement shall not be required to be recorded in its entirety, then Ramada and Licensee will execute an instrument, recordable in form, setting forth the Term, and such other information as may be necessary to constitute a Declaration of License Agreement, and such other information as Ramada shall determine and said instrument shall be forthwith recorded in the appropriate recording office at the expense of Licensee.

26. **Partial Invalidity**. Should any part of this Agreement, for any reason, be declared invalid, such decision shall not affect the validity of any remaining portion; provided, however, that if in the sole judgment of Ramada such declaration of invalidity shall substantially impair the value of this Agreement to the Ramada, the Ramada may at any time thereafter terminate this Agreement by written notice to the License and this Agreement shall thereupon terminate except as to those provisions relating to the taking of action or the abstaining from the taking of action by the Licensee after the termination thereof.

27. **Additional Licensee Acknowledgments**. Licensee acknowledges that Ramada may, in its sole discretion, depending upon local market conditions or assessment of special circumstances, from time to time, (i) grant other licensees areas in which no other System hotel will be franchised, for periods of time determined by Ramada; and (ii) permit deviations from the provisions of this Agreement including, without limitation, those provisions relating to Initial Fees and Recurring Fees.

28. **No Waiver**. No failure or delay in requiring strict compliance with any obligation of this Agreement (or in the exercise of any right or remedy provided herein) and no custom or practice at variance with the requirements hereof shall constitute a waiver or modification of any such obligation, requirement, right or remedy or preclude exercise of any such right or remedy or the right to require strict compliance with any obligation set forth herein. No waiver of any particular default or any right or remedy with respect to such default shall preclude, affect or impair enforcement of any right or remedy provided herein with respect to any subsequent default. No approval or consent of Ramada shall be effective unless in writing and signed by an authorized representative of Ramada. Ramada's consent or approval may be withheld for so long as Licensee is in default of any of its obligations under this Agreement.

29. **Notices**. Notices will be effective hereunder when and only when they are reduced to writing and delivered, by next day delivery service, with proof of delivery, or mailed by certified or registered mail, return receipt requested, to the appropriate party at its address stated below or to such person and at such address as may be designated by notice hereunder. Notices shall be deemed given on the date delivered or date of attempted delivery, if service is refused.


LICENSEE:                          RAMADA:

Y & Y, Inc.                        RAMADA FRANCHISE SYSTEMS, INC.
1328 Jake Alexander Blvd.          339 Jefferson Road
Salisbury, NC  28146-8356          P.O. Box 278
                                   Parsippany, New Jersey  07054

Attention: Kiron K. Patel          Attention:  President


30. **Miscellaneous**. The remedies provided in this Agreement are not exclusive. This Agreement will be construed in accordance with the laws of

the State of New York. Licensee consents to the personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York and further waives objection to venue in any such court. This Agreement is exclusively for the benefit of the parties hereto and may not give rise to liability to a third party. No agreement between Ramada and anyone else is for the benefit of Licensee. Neither party will interfere with contractual relations of the other and exercise by Ramada of any right provided Ramada under this Agreement shall not constitute such interference. The section headings in this Agreement are for convenience of reference only and will not affect its interpretation.

31. <u>Additional Stipulations.</u>

(a) <u>Mutual Termination</u>. Notwithstanding any provisions set forth in Section 21 to the contrary, either party may terminate this Agreement, effective the day before the fifth or tenth anniversary from the Opening Date. Said termination shall only be effective, if notice of termination has been provided in writing more than six months prior to the effective date of termination. Licensee must pay all monies due and owing to Ramada through the date of termination. If notice shall not have been given by Licensee in accordance herewith then it shall be deemed conclusively to have been waived. In the event that notice shall have been properly given and provided that Licensee is not in default of this Agreement at the time notice is given, then this Agreement shall terminate on the day before the fifth or tenth anniversary of the Opening Date and Licensee will not be obligated to pay Liquidated Damages. The right of Licensee to terminate this Agreement pursuant to this subsection is contingent upon Licensee continuously maintaining Quality Assurance Scores of 425 points or more for the first ten years of the License Grant Term. If prior to the expiration of the aforementioned period, the Facility receives a Quality Assurance score of less than 425 points or is in default of this License Agreement, then without written notice, Licensee's right of termination pursuant to this subsection shall immediately cease and be of no further force and effect for the balance of the License Grant Term.

This Agreement, together with all instruments, exhibits, attachments and schedules hereto, constitutes the entire agreement (superceding all prior agreements and understandings, oral or written) of the parties hereto with respect to the Facility and shall not be modified or amended in any respect except in writing executed by all such parties.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

RAMADA:

RAMADA FRANCHISE SYSTEMS, INC.

BY: _____
    (Executive Vice) President

ATTEST: _____
        (Assistant) Secretary

LICENSEE:

Y & Y, INC.
a North Carolina Corporation

BY: _____
    (Vice) President

ATTEST: _____
        (Assistant) Secretary

-25-

STATE OF NEW JERSEY )
)SS
COUNTY OF MORRIS )

    I HEREBY CERTIFY that on this day before me, an officer duly authorized in the state and county aforesaid to take acknowledgments, personally appeared *Gregory D Casserly* and *Richard M Saltzman*, to me known and known to be the (Vice) President and (Assistant) Secretary of RAMADA FRANCHISE SYSTEMS, INC., and they acknowledged before me that they executed the within instrument as such officer, and that they were authorized to do so, and that such was the free act and deed of the corporation.

    WITNESS my hand and seal this 30th day of June, 1992.

*Judith Greenberg*
Notary Public

My Commission expires:

JUDITH GREENBERG
Notary Public of New Jersey
My Commission Expires May 11, 1997

STATE OF North Carolina )
)SS
COUNTY OF Rowan )

    I HEREBY CERTIFY that on this day before me, an officer duly authorized in the state and county aforesaid to take acknowledgments, personally appeared *KIRON PATEL* and *DILIP PATEL* to me known and known to be the (Vice) President and (Assistant) Secretary of Y & Y, INC., a North Carolina Corporation, and they acknowledged before me that they executed the within instrument as such officer, and that they were authorized to do so, and that such was the free act and deed of the corporation.

    WITNESS my hand and seal this 23rd day of June, 1992.

*Christine Natalie Craig*
Notary Public

My Commission Expires:

9/22/96

-26-

## SCHEDULE A

(Legal Description of Facility)

EXHIBIT A. PURCH. AGREEMENT

562

FILED
BOOK 562
DEC 0 4 PH '87
DAVIDSON CO. N.C.
07776-81876-1015

**Recording Time, Book and Page**

Tax Lot No. .......................................... ... ... .......... Parcel Identifier No. ...... ...................

Verified by ........................................... County on the .... .... day of ........... ... ...... ......., 19...

by ..........................................................

Mail after recording to .............................................................................................................

This instrument was prepared by .George W. Saintsing, Atty., P. O. Box 1136, Thomasville, NC 27360

Brief description for the Index

## NORTH CAROLINA GENERAL WARRANTY DEED

THIS DEED made this ....2nd.... day of ...... .... October ......, 19 87  .., by and between

| GRANTOR | GRANTEE |
|---|---|
| CLYDE E. SLATEN and wife, SARAH C. SLATEN | Y. & Y., INC., a North Carolina Corporation |

Enter in appropriate block for each party: name, address, and, if appropriate, character of entity, e.g corporation or partnership.

The designation Grantor and Grantee as used herein shall include said parties, their heirs, successors, and assigns, a shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantor, for a valuable consideration paid by the Grantee, the receipt of which is here acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all th certain lot or parcel of land situated in the City of ................... ....................................., Thomasville ...... Townsh

.................. Davidson ........ County, North Carolina and more particularly described as follows:

BEGINNING: At a point, said point being the Northeast intersection of
N. C. Highway 109 and Laura Lane; thence with the eastern right of way
line of said Highway North 6° 24' East 180.00 feet to a point, said point
being the northwest corner of Lot No. 2, Rolling Acres, Section 2, Block A;
thence with Davidson Properties, Inc. line South 83° 45' East 570.0 feet
to a point located at the common Northern corner of Lots 6 and 7; running
thence with the common line of Lots 6 and 7 South 6° 25' West 181.49 feet
to a point in the Northern right of way line of Laura Lane, said point
being the common Southern corner of said Lots 6 and 7; running thence
with the Northern right of way line of Laura Lane North 83° 44' West 570.0
feet to the point and place of beginning.

The same being all of Lots 1, 2, 3, 4, 5, and 6, Rolling Acres, Section 2,
Block A, as is shown and recorded in Plat Book 11, .... 21, Office of
the Register of Deeds for Davidson County, North Carolin

LESS AND EXCEPT from the above described parcel of la.. .... of the portion
of same previously conveyed to First-Citizens Bank and T .... Company.

For back reference see Deed Book 445, Page 89, Davids.. .ounty Registry.
See also Deed Book 606, Page 748.

N C. Bar Assoc. Form No. 3 © 1976, Revised © 1977 — James Williams & Co. Inc. Box 127, Yadkinville, N C 27055

## SCHEDULE B

**PART I:  DESCRIPTION OF FACILITY AND OWNERSHIP OF LICENSEE:**

Number and type of approved guest rooms:

_____0_____  Suites

_____52_____  Standard Rooms

Restaurants and lounges (number, seating capacity, names and description):
    None

Gift Shop:
    None

Other concessions and shops:
    None

Parking facilities (number of spaces, description):
    N/A

Swimming pool:
    Outdoor Pool

Other facilities and services, such as Meeting and Banquet Rooms, Conference Center, etc.:
    None

Ownership of Licensee:
    Dr. K. C. Patel — 25%
    Kiron Patel — 25%
    Dilip Patel — 25%
    Pankas Patel — 25%

**PART II:  DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED BY LICENSEE:**

Improvements must be made to the Facility pursuant to the attached punchlist and to the extent necessary to achieve minimum quality assurance inspection test scores of 400 prior to commencing operation of the Facility under the System and 425 within nine (9) months after the Opening Date. Licensee must commence renovation on or before 30 days after the date of this Agreement and pass a quality assurance inspection with a score of 400 or better and be ready, willing and able to open the Facility under the System on or before 90 days after the date of this Agreement to satisfy the Construction Obligation. [The Facility may not remain open for business during Licensee's performance of the Construction Obligation.]

SCHEDULE C
TO
<u>RAMADA LICENSE</u>

As provided in Section 6 of the Ramada License Agreement, Licensee will pay to RINA (not later than the 15th day of the following month) for each month (or part thereof) during the term of this License:

RINA Services Assessment Fee of four and one-half percent (4.5%) of Gross Room Revenues, payable monthly for Advertising, Promotion, Training, Reservation and other related services and programs.

As resolved by the Ramada Inter-National (RINA) Executive Committee, commencing immediately, an additional sum equal to the RINA convention registration fee for one person will annually be assessed to each property.

# Exhibit B

02226-81896-1015

## GUARANTY

As an inducement to Ramada Franchise Systems, Inc. ("Ramada") to execute the above agreement, the undersigned, jointly and severally, hereby unconditionally warrant to Ramada and its successors and assigns that all of Licensee's representations in the Agreement are true and guarantee that all of Licensee's obligations under the above agreement, including any amendments thereto whenever made (the "Agreement"), will be punctually paid and performed.

Upon default by Licensee or notice from Ramada, the undersigned will immediately make each payment and perform each obligation required of Licensee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, Ramada may without notice to the undersigned extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment or performance by Licensee.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this guarantee but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the date of the above agreement.

Witnesses:                                  Guarantors:

_____                     _____
                                            Dr. K. C. Patel

_____                     _____
                                            Kiron Patel

_____                     _____
                                            Dilip Patel

_____                     _____
                                            Pankaj Patel

# Exhibit C



April 6, 2005

**VIA AIRBORNE EXPRESS**

|Z22445X01 9293 5|00

Mr. Kiron K. Patel
Y&Y Inc.
1328 Jake Alexander Blvd.
Salisbury, NC 28146-8356

Re:   **ACKNOWLEDGEMENT OF TERMINATION** of the License for Ramada® System
      Unit #2226-81896-1 located at Thomasville, NC (the "Facility")

Dear Mr. Patel:

Ramada Worldwide Inc., formerly known as Ramada Franchise Systems, Inc. ("we" "our" or "us")
has received a letter dated March 18, 2005 advising us that on March 31, 2005 (the "Termination
Date"), Y&Y, Inc. ("you" or "your") stopped operating the Facility as a Ramada. Accordingly, we
acknowledge that the License Agreement, dated June 24, 1992 (the "Agreement"), has terminated.

The Agreement requires you to perform certain post termination obligations. In addition to other
obligations specified in the Agreement, by no later than fourteen days after the Termination Date,
you must (a) remove all signage and other items bearing the Ramada Marks; (b) perform all post-
termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards,
and listings in telephone directories, travel guides, hotel indexes and similar materials in which the
Facility is identified as a Ramada; and (d) remove the Ramada Marks from any advertising or
promotional activities on, around or directed towards the Facility, including any web sites, web
pages or search engines.   You must cooperate fully with us regarding any post-termination
inspections by us to verify that the Facility has been properly de-identified. You must immediately
return to us all training documents, operating manuals and other proprietary material.

Because you terminated the Agreement prematurely, you must pay us Liquidated Damages of
$104,000.00, as specified in Section 22 of the Agreement. You must also pay any outstanding
Recurring Fees and any other fees and charges through the date you complete the de-identification
of the Facility. We estimate that, as of March 30, 2005, you owe us $4,803.24 in such fees and
charges.  Please pay us this amount within fourteen days.  Please consider this letter to be a notice
and demand for payment under any Guaranty of the Agreement, directed to all of your guarantors.

Mr. Kiron K. Patel
April 6, 2005
Page 2

If you have any questions, please contact Randi Siouffi, Manager of Settlements, at (866) 582-9104, option 6.

Sincerely,

Kathy Cox
Senior Director
Franchise Administration

Enclosure

cc:    Mr. P.K. Patel (Site Principal)
       Dr. K.C. Patel (Guarantor)
       Dilip Patel (Guarantor)
       Pankaj Patel (Guarantor)
       Keith Pierce
       Randi Siouffi

```
ITEMIZED STATEMENT                              PAGE 1
FOR RAMADA #2226-81896 - Thomasville-Laura Lane, NC
AS OF 2005-03-30


              RELATION    ITEM                              AMOUNT
      MONTH   NBR         DATE       DESC                    DUE
      -----   ----------  ---------  ----------------        ------------------  ----
         11   IN1417288-01  2004-11-24  NOV-HSS SOFTWARE MAI        94.00
              IN1417288-02  2004-11-24  TRIPREWARDS 5%CHRGBK        82.00
              IN1417288-03  2004-11-24  TRIPREWARDS FNS CRDT       -30.86
              TA3008037-01  2004-11-25  T/A COMM SERVICE CHG         0.35
              TA3008037-01  2004-11-25  T/A COMMISSIONS              8.80
              IN1425033-01  2004-11-30  NOV-PPU HARDWARE MAI        82.20
                                                            ------------------
                                                                236.49

         12   IN1431701-01  2004-12-22  DEC-HSS SOFTWARE MAI        94.00
              TA3014184-01  2004-12-23  T/A COMM SERVICE CHG         1.75
              TA3014184-01  2004-12-23  T/A COMMISSIONS             40.00
              TP4014184-01  2004-12-23  GDS & INTERNET BKGS         21.50
              IN1438236-01  2004-12-29  TRIPREWARDS 5%CHRGBK        43.00
              FC0300165-01  2004-12-31  FINANCE CHARGE              18.66
                                                            ------------------
                                                                218.91

          1   IN1448179-01  2005-01-26  JAN-HSS SOFTWARE MAI        94.00
              IN1448179-02  2005-01-26  TRIPREWARDS 5%CHRGBK        70.42
              TA3020304-01  2005-01-28  T/A COMM SERVICE CHG         2.80
              TA3020304-01  2005-01-28  T/A COMMISSIONS             83.40
              TP4020304-01  2005-01-28  GDS & INTERNET BKGS         40.00
              FC0303442-01  2005-01-31  FINANCE CHARGE               4.09
                                                            ------------------
                                                                294.71

          2   IN1461285-01  2005-02-23  FEB-HSS SOFTWARE MAI        94.00
              IN1461285-02  2005-02-23  TRIPREWARDS 5%CHRGBK       114.07
              TA3026171-01  2005-02-25  T/A COMM SERVICE CHG         2.45
              TA3026171-01  2005-02-25  T/A COMMISSIONS             58.64
              TP4026171-01  2005-02-25  GDS & INTERNET BKGS         25.50
              FC0306829-01  2005-02-28  FINANCE CHARGE               6.47
              MV0907289-01  2005-02-28  ROYALTY FEE              1,117.00
              MV0907289-02  2005-02-28  RINA FEE                 1,256.00
                                                            ------------------
                                                              2,674.13

          3   IN1472193-01  2005-03-09  2ND RMA 2005 PYMT          390.00
              IN1476869-01  2005-03-23  MAR-HSS SOFTWARE MAI        94.00
              IN1476869-02  2005-03-23  2005 RINA CONF REG         895.00
                                                            ------------------
                                                              1,379.00

                                                            ==================
                                                              4,803.24
```

## Property Termination Profile Checklist

Prepared by: _Lon Wilson_

Date: _GREEN 3/30/05_

Termination Requested by: _Licensee_

| Site Information | |
|---|---|
| Brand | Ramada |
| Unit # (include entity and sequence #) | 2226- 81894-1 |
| Site Address: | 5 Laura Lane Thomasville, NC 27360 336-472-0700 |
| Number of Approved Guest Rooms: | 52 |
| Has the Brand been notified of the pending termination? | ☐ Y  ☐ N  ☒ N/A |
| Did the Brand approve proceeding with termination? | ☐ Y  ☐ N  ☒ N/A |
| Has the Unit filed for Bankruptcy? | ☐ Y  ☒ N |
| If yes, do we have a Stay of Relief for the court to proceed with termination? | ☐ Y  ☒ N  ☐ N/A |
| Termination occurring for: | ☐ $ ☐ QA ☐ $ and QA ☒ NNO |
| For units in AR, MN & WI which are being terminated for QA – Has a re-inspection of the Unit happened? (If not do not proceed with termination) | ☐ Y  ☐ N  ☒ N/A |
| Is the Unit located in a special termination period State? (60 days – CT, NE & NJ 90 days- AR, DE, MN, MS, MO & WI) | ☐ Y  ☒ N |
| If yes, has the applicable special termination period been given? | ☐ Y  ☐ N  ☒ N/A |
| Has a Collection Action been filed? | ☐ Y  ☒ N |

| License Agreement Information | |
|---|---|
| Effective Date of LA: | 8/24/92 |
| Opening Date (or Commencement Date if sites Transferred or renewed): | 4/21/93 |
| Expiration Date of LA: | 4/21/08 |
| Pending Termination Date: | 3/31/05 |
| Entity Name and Address (address sending letter to): | MR Kirank Patel 484 inc. 1328 Jake Alexander Blvd. Salisbury NC 28146-8356 |
| Is there a Guarantor(s) listed in the LA? | ☐ Y  ☒ N |
| If applicable, list guarantors. | Dr. K.C. Patel Kiran Patel Dilip Patel Pankaj Patel |
| Is there a Three Party Agreement, Comfort Letter or Lender Notification Agreement? | ☐ Y  ☒ N |
| If applicable, please list Lender name and address | N/A |
| Per the LA, list the United States District Court (USDC). | NY |

| Actual Damages | | |
|---|---|---|
| Is the Unit located in an Actual Damages State? (ND, SD, MN & IN) If no, proceed to the Liquated Damages section. If yes, continue with this section | ☐ Y  ☐ N | |
| Actual Damages amount: | | |
| Please demonstrate how you arrived at this amount. (Also include a print out of AP4) | | |

| Liquated Damages | | |
|---|---|---|
| Is the Unit located in an Actual Damages State? (ND, SD, MN & IN) If no, proceed to this section. If yes, proceed to the Actual Damages section. | ☐ Y  ☒ N | |
| Liquated Damages amount: | | $104,000 |
| List the section of the LA that was used to calculate Liquated Damages | 22 | Number of Approved Guest Rooms: 52 |
| Please demonstrate how you arrived at this amount. | | |

24 months fees = $70,083

but no less than $2,000 x 52
$104,000

| Direcway LDs | | |
|---|---|---|
| Has Direcway been installed?  (Check ACD, Set 7, VSAT Installed) | ☐ Y  ☒ N |
| If yes, ensure Direcway LDs are included in document?  ($1,000) | ☐ Y  ☐ N  ☒ N/A |

| Outstanding Note Information | | |
|---|---|---|
| Is there an outstanding note amount? (check spreadsheet on K drive & if there is email Finance) | ☐ Y  ☒ N |
| If yes, ensure that amount is noted in document & email is attached confirming amount? | ☐ Y  ☐ N  ☒ N/A |

| QA Review (Complete if terminating for QA reasons) | | | | | |
|---|---|---|---|---|---|
| Inspection Date (list first inspection failure to recent inspection failure) | Score | Default Letter Date | Type of Default (e.g. 1st, 2nd Non-conformance) | Was the lender notified? | Were the guarantors notified? |
| | | | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A |
| | | | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A. |
| | | | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A |
| | | | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A |

| AR Review (Complete if terminating for Monetary reasons) | | | | |
|---|---|---|---|---|
| Outstanding Balance as of | | Last Reported (month/year) | | |
| Type of Default Sent (e.g. 1st, 2nd) | Default Letter Date | Was the lender notified? | Were the guarantors notified? | |
| | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A | |
| | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A | |
| | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A | |
| | | ☐ Y  ☐ N  ☐ N/A | ☐ Y  ☐ N  ☐ N/A | |

| Legal Approval | | | | Attorney Approval |
|---|---|---|---|---|
| Approved to proceed with Termination & damages calculation correct | ☒ Y | ☐ N | | |

| Franchise Administration Approval | | | | Manager Approval |
|---|---|---|---|---|
| Approved to proceed with Termination | ☐ Y | ☐ N | | |
| FIS Termination Code (Comp. Spec. please fill in) | NNO | | | |
| FIS Sub Status Code (Comp. Spec. please fill in) | | | | |

### Review of Termination Letter

Categories that are highlighted must be corrected or researched by the Compliance Specialist. The Compliance Specialist must then initial that the correction or research has been completed. The Manager will then counter-initial that correction or research has been completed.

| Category | Yes or No | Manager's Initials | Compliance Specialist's Initials | Counter-Initials of Manager |
|---|---|---|---|---|
| Has the Entity filed for Bankruptcy? | ☐ Y ☑ N | | | |
| If yes, have we received a Stay of Relief from the Court? (If no, please follow up with Legal before terminating) | ☐ Y ☐ N ☑ N/A | | | |
| Letter addressed to correct person (Legal contact) | ☑ Y ☐ N | | | |
| Correct Entity Name | ☑ Y ☐ N | | | |
| Correct Unit, Entity and sequence # | ☑ Y ☐ N | | | |
| Correct Unit Location | ☑ Y ☐ N | | | |
| Correct Brand throughout document | ☑ Y ☐ N | | | |
| Correct Salutation | ☑ Y ☐ N | | | |
| Correct termination date through out the letter? | ☑ Y ☐ N | | | |
| Is the Facility located in an Actual Damages State? (ND, SD, MN & IN) | ☐ Y ☑ N | | | |
| If yes, has the letter been modified to say actual damages instead of liquated damages? | ☐ Y ☑ N/A | | | |
| Is the LD or Actual Damages amount correct? | ☑ Y ☐ N | | | |
| If Direcway has been installed, are the Direcway LDs been included? | ☐ Y ☐ N ☑ N/A | | | |
| Is the correct itemized statement balance reflected in the letter? | ☑ Y ☐ N | | | |
| If there are o/s Notes, is the email attached reflecting current balance? | ☐ Y ☐ N ☑ N/A | | | |
| Is there a Three Party Agreement, Comfort Letter or Lender Notification Agreement? | ☐ Y ☑ N | | | |
| If yes, is the Lender cc'd on the letter? | ☐ Y ☑ N/A | | | |
| Is there a Guarantor(s) listed in LA? | ☑ Y ☐ N | | | |
| Is one of the Guarantors the addressee receiving the letter? | ☑ Y ☐ N ☐ N/A | | | |
| If no, is the Guarantor(s) listed in the letter under the carbon copies (cc)? | ☑ Y ☐ N ☐ N/A | | | |
| Revise as noted | ☑ Yes | | JSW | |

Comments:

```
FI44       1    11 1     FRANCHISE INFORMATION SYSTEM              03/30/05
5A0X     FADJYW          PROPERTY SUMMARY OF ROYALTIES             15:00:58

SITE:   2226 Thomasville-Laura Lane      CHAIN: RAM      PROPERTY: 02226
ENTITY: 81896 Y&Y Incorporated, Inc.
FROM:   03 / 2004  TO:  02 / 2005

YR  MO     ROOM       ADV
04   3       915      1,030
04   4     1,974      2,221
04   5     1,398      1,573
04   6     1,177      1,324
04   7     1,434      1,614
04   8     1,485      1,671
04   9     1,365      1,535
04  10     2,058      2,316
04  11       909      1,022
04  12     1,035      1,164
05   1     1,196      1,346
05   2     1,117      1,256
TOTAL     16,064     18,073      = 34,137

PF        3:EXIT 5:PREV 6:NEXT 7:BWD 8:FWD 10:LEFT 11:RIGHT 12:CAN  CMD: ____
```

34,137 + 35,946 =
70,083

```
FI44     1    11 1      FRANCHISE INFORMATION SYSTEM          03/30/05
5A0X    FADJYW          PROPERTY SUMMARY OF ROYALTIES         15:01:03

SITE:    2226 Thomasville-Laura Lane      CHAIN: RAM     PROPERTY: 02226
ENTITY: 81896 Y&Y Incorporated, Inc.
FROM:    03 / 2003   TO:  02 / 2004

YR   MO     ROOM          ADV
03    3     1,470        1,654
03    4     2,159        2,430
03    5     1,666        1,874
03    6     1,044        1,175
03    7     1,216        1,368
03    8     1,400        1,575
03    9     1,436        1,615
03   10     2,388        2,687
03   11     1,042        1,172
03   12     1,029        1,158
04    1     1,117        1,257
04    2       946        1,065
TOTAL      16,915       19,031

PF      3:EXIT 5:PREV 6:NEXT 7:BWD 8:FWD 10:LEFT 11:RIGHT 12:CAN  CMD: ____
```

35,946